| Minute Order Form (06/97) | United States District Court, Northern District of Illinois | | |
|---|---|---|---|
| Name of Assigned Judge or Magistrate Judge | Nan R. Nolan | Sitting Judge if Other than Assigned Judge | |
| CASE NUMBER | 02 C 21 | DATE | 7/14/2003 |
| CASE TITLE | Mueller vs. McGrath Lexus of Chgo | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the attached Memorandum Opinion and Order, McGrath has established an affirmative defense to liability under Title VII and, thus, its Motion for Summary Judgment [17-1] is granted. McGrath's Motion to Strike Certain Paragraphs of Plaintiff's Statement of Facts [23-2] is also granted. McGrath's Motion to Deem as Admitted Certain Statements Contained in Rule 56.1 Statement of Facts [23-1], McGrath's Motion to Strike Plaintiff's Response Brief [23-3] and Mueller's Motion to Strike [27-1] are all denied. Judgment is hereby entered in favor of the defendant, McGrath Lexus of Chicago, and against Plaintiff.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | 2 number of notices | |
| | No notices required. | | |
| ✓ | Notices mailed by judge's staff. | JUL 17 2003 date docketed | 36 |
| | Notified counsel by telephone. | | |
| | Docketing to mail notices. | | |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 7/15/2003 date mailed notice | |
| cav | courtroom deputy's initials | cav6 mailing deputy initials | |

U.S. DISTRICT COURT
CLERK
03 JUL 16 PM 5:12
Date/time received in central Clerk's Office

| | |
|---|---|
| SAMANTHA MUELLER, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>McGRATH LEXUS OF CHICAGO, )<br>)<br>Defendant. ) | Case No. 02 C 0021 |

## MEMORANDUM OPINION AND ORDER

NAN R. NOLAN, Magistrate Judge:

Plaintiff Samantha Mueller filed a complaint against defendant McGrath Lexus of Chicago ("McGrath") alleging that she was sexually harassed by her supervisor in violation of Title VII of the Civil Rights Act, 42 U.S.C. §2000e *et seq*. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. §636(c). *This matter is now before the Court on McGrath's motion for summary judgment.* For the reasons set forth below, the motion is granted.

## FACTUAL BACKGROUND

McGrath is an automobile dealership that sells and services new and used cars. It has been in business since April 1999 and is owned by Michael McGrath, Sr. Def. Facts ¶¶3, 4. On August 6, 2000, McGrath placed an advertisement in the Chicago Tribune seeking a Finance Assistant "to support our growing F & I [finance and insurance] department." The ad stated that experience was preferred but the dealership would train the right individual. *Id.* ¶9. Mueller responded to the classified ad and filled out an employment application on August 8, 2000. After



an interview with McGrath's General Manager, Tom Druzik, and a meeting with Finance Manager Richard Madonia, Mueller was hired as a Finance Assistant. She began working on August 14, 2000, assisting Madonia and Will Mulcahey, McGrath's other Finance Manager. *Id.* ¶¶6, 7, 18-23.

The duties of the Finance Assistant position were clerical and included filing, answering telephones, making calls for payoff information on finance deals, verifying customer insurance, completing the processing of paperwork, and performing basic computer work. Def. Facts ¶¶12, 13. However, Mueller claims that Druzik told her she would also receive training to become an assistant finance manager. She had no idea how long it would take for her to be promoted but she guessed it would be approximately three months. *Id.* ¶24; Pl. Resp. ¶¶10, 24.

At the time of her hire, Mueller received a copy of McGrath's Employee Handbook. The Handbook contained a No Harassment Policy prohibiting sexual and other harassment in the workplace. The policy stated that an employee who felt harassed should "immediately notify the president, general manager or office manager at once." In addition, the Handbook generally encouraged employees with problems to contact any of the same individuals. Mueller understood the policy and acknowledged that she received it. Def. Facts ¶¶29-31.

### A. Plaintiff's Employment

On her first day of work, Mueller complained to Madonia that she did not feel she received an adequate amount of training for her Finance Assistant position. Def. Facts ¶33. Madonia was very busy during the normal work day and offered to provide Mueller with training on Sunday, a day he often worked because the dealership was closed and quiet. Mueller felt that her training should be done during regular hours and stated that she was unavailable. *Id.* ¶¶34,

2

35. The next day, Mueller again told Madonia that she was not satisfied with the level of training she was receiving. Madonia repeated his suggestion that they meet on Sunday but Mueller declined. Pl. Dep., pp. 87-88.

On Wednesday, August 16, 2000, Madonia was busy working with lenders from various banks and he asked Mueller to buy him cigarettes or breakfast. In fact, Madonia asked Mueller to get him coffee, cigarettes and breakfast several times throughout her first week of employment. In the afternoon, Madonia provided Mueller with some computer training and then she spent the rest of the day observing him. After a day off on Thursday, Mueller made a third complaint to Madonia about her lack of training on Friday, August 18. Madonia once again suggested meeting on Sunday and asked Mueller if she was divorced; Mueller once again refused to work with Madonia alone on Sunday. Def. Facts ¶¶40-44, 49; Pl. Facts ¶7; Pl. Dep., pp. 93, 97. On Saturday, August 19, 2000, Mueller looked up lost files and did paperwork for the office staff. She also bought Madonia coffee and cigarettes. Def. Facts ¶¶46-48. On August 21 and 22, 2000, Mueller renewed her complaints to Madonia about the lack of training and he told her that he would get to it. *Id.* ¶¶51-53.

### B. Madonia's Telephone Calls

Beginning at 12:11 a.m. on the morning of August 23, 2000, Mueller received two telephone calls at home from Madonia asking her for a sexual relationship. Madonia said that he wanted to "put it in her" and "f" her, and he offered to pay for a cab so that she could spend the night at his place. Mueller thought Madonia sounded drunk and she told him that he was "out of line." She also threatened to report the calls to someone at McGrath. After the second call, Mueller took her telephone off the hook. Def. Facts ¶¶54-57; Pl. Facts ¶¶3, 4. At 6:49 a.m. the

3

same day, Madonia left a message on Mueller's answering machine telling her that if she had already left, he would see her at work. Mueller confronted Madonia at work that day and he apologized to her, stating that he had too much to drink and felt badly about his behavior. Madonia then proceeded to leave five more telephone messages for Mueller during the evening of August 23 and the morning of August 24, each time asking her to call him. *Id.* ¶¶58-60; Pl. Facts ¶5.

Mueller does not recall whether she received any training on August 23 but she does recall being very busy due to a sales competition with another dealership. Thursday was her regularly-scheduled day off and either that day or Friday, August 25, Madonia called her at home and asked if she would have sex with him. Def. Facts ¶¶62-64; Pl. Facts ¶8.

### C. Mueller's Complaints to McGrath

On Saturday, August 26, 2000, Mueller complained to Druzik about Madonia's telephone calls. This was the first time she ever complained about Madonia to anyone at McGrath. Def. Facts ¶¶61, 65; Pl. Resp. ¶¶61, 65. Mueller told Druzik that she had received sexually explicit telephone calls from Madonia and wanted them to stop. Def. Facts ¶¶66-67. She said that she did not want anything to happen to Madonia and that she did not want the complaint to go any further than Druzik. Druzik responded that he had to tell his supervisors and that he would take care of the problem. He asked Mueller if she would like to go home for the day but she said that she would stay. *Id.* ¶¶68, 71, 72. After receiving Mueller's complaint, Druzik immediately contacted McGrath, Sr. to discuss the situation, and began an investigation. *Id.* ¶¶76, 118, 120.

Druzik claims that he met with Madonia later that day for approximately 15 to 30 minutes and severely reprimanded him for his conduct. At that time, Druzik says, he instituted a "zero

4

tolerance" policy for Madonia and told him that he would be discharged immediately if McGrath received another complaint of any similar misconduct. Def. Facts ¶¶121-24. Despite this conversation, Druzik later told Mueller to take off Monday, August 28, 2000 instead of her regular day off on Thursday, apparently so that he could talk to Madonia again. *Id.* ¶¶74, 75. A few days after Druzik reprimanded Madonia the second time, McGrath, Sr. met with both men together and severely reprimanded Madonia for his conduct. McGrath, Sr. confirmed that Madonia would be fired immediately if the dealership received any similar complaints about him. *Id.* ¶¶125-27. Though Mueller denies it, McGrath, Sr. claims that the same day, he also spoke with Mueller about the allegations and that she reiterated her desire to have the calls stop without Madonia getting in trouble. *Id.* ¶¶109-10, 128-29; Pl. Resp. ¶128.

When Mueller called Druzik on Monday, August 28, 2000, he told her that Madonia had been spoken to "very strongly" and that she should come to work the next day. Def. Facts ¶¶77-78. On Tuesday, August 29, Madonia ignored Mueller and would not acknowledge that she was in the office. *Id.* ¶79; Pl. Resp. ¶79. He did, however, ask her to get his breakfast, coffee and cigarettes as usual. *Id.* ¶¶82, 83. On September 2, 2000, Madonia told Mueller to take Labor Day off of work. Mueller said that Mulcahey was going to provide her with training that day and that she wanted to work. Mulcahey did provide Mueller with some training on Labor Day but she went home early because the dealership was slow. *Id.* ¶¶87-89.

While working on a project with Connie Ahlness, McGrath's Chief Financial Officer, on Tuesday, September 5, 2000, Mueller complained about not receiving proper training from Madonia at any time during her employment. Ahlness responded by saying, "Oh no, not again." Def. Facts ¶¶5, 90, 95. Madonia had previously failed to properly train an assistant named Sandy

5

Sorice, who worked in the finance department on a part-time basis for a short period and ultimately left for personal medical reasons. *Id.* ¶¶96, 97, 142-52. Ahlness suggested sending Mueller to the Westmont store to receive training from another Finance Manager with a reputation for being a good trainer. Mueller thought this was a great idea and agreed to go. *Id.* ¶¶98, 99.

At some point during the conversation, Mueller also told Ahlness that Madonia had made a "nasty" sexual harassment call to her at home. Def. Facts ¶¶101, 102; Pl. Resp. ¶¶101, 102. The women have very different recollections regarding the substance of that conversation. Mueller claims that Ahlness's response was similar to the one she gave to the lack of training complaint – namely, "Oh, my God, not again" – and that Ahlness asked if Madonia was drunk. Pl. Resp. ¶101. Ahlness denies making such a statement and claims that Mueller was unwilling to elaborate on any of the details of the calls. According to Ahlness, Mueller said that she liked Madonia and did not want him to get in trouble, and she asked Ahlness to drop the matter. Ahlness responded that she could not ignore the complaint and asked Mueller to write out a statement so that McGrath could investigate. Def. Facts ¶¶102-106. Mueller asserts that she told Ahlness all about Madonia's conduct and does not recall saying that she did not want an investigation. Mueller claims that she felt pressured to provide a detailed account of what happened and believed that she had to submit a written statement before she could receive the training at Westmont. Pl. Resp. ¶¶102, 103; Pl. Facts ¶31. Ahlness denies telling Mueller that her training was conditioned on her providing a written complaint. Def. Facts ¶176.

6

### D. Mueller's Decision to Quit Her Job

On September 8 or 9, 2000, Mueller called Madonia and said that she could no longer work at McGrath because she was not being trained. Mueller then wrote a note to Ahlness thanking her for being her "best cheerleader and someone [she] could talk to about a complicated and nasty situation," and stating that she would not take her complaints against Madonia any further. Mueller also sent Ahlness a book on teamwork as a gift. Def. Facts ¶¶112-14, 116. On September 11, 2000, Linda Yanos, McGrath's office manager, left two telephone messages for Mueller asking that she call to discuss why she did not go to work that day. Druzik and McGrath, Sr. left similar messages for Mueller the same day. *Id.* ¶¶133-35.

Mueller eventually spoke with McGrath, Sr. and he offered her a job selling used cars in Westmont. According to Ahlness, Mueller had mentioned an interest in getting back into sales during their talk on September 5, 2000. Mueller insists that at all times she wanted to remain in finance, but she told McGrath, Sr. that she was interested in the position and went for an interview. She was offered the job but did not take it because, she says, the interviewer told her that "women didn't last at the [Westmont] dealership very long." Def. Facts ¶¶100, 136-38; Pl. Resp. ¶¶100, 141.

### DISCUSSION

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, we view

7

the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### A. Sexual Harassment Under Title VII

Title VII prohibits any workplace discrimination with respect to "compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. §2000e-2(a)(1); *Hardy v. University of Illinois at Chicago*, 328 F.3d 361, 364 (7th Cir. 2003). Sexual harassment is a form of sex discrimination, and employers violate Title VII by permitting a sexually hostile work environment. *See Cerros v. Steel Technologies, Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002). To prevail on her claim of sexual harassment based on a hostile work environment, Mueller must establish that: (1) she was subjected to unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature; (2) the conduct was severe or pervasive enough to create a hostile work environment; (3) the conduct was directed at her because of her sex; and (4) there is a basis for McGrath's liability. *Quantock v. Shared Marketing Services, Inc.*, 312 F.3d 899, 903 (7th Cir. 2002) (citing *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 462-63 (7th Cir. 2002)). McGrath challenges the second and fourth of these elements.

### B. Severe or Pervasive Conduct

To be actionable sexual harassment, conduct must be sufficiently "severe or pervasive" to "alter the conditions of [the victim's] employment and create an abusive working environment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 785 (1998) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). In making this determination, courts consider "the totality of the circumstances, including . . . 'the frequency of the discriminatory conduct, its severity,

8

whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." *Quantock*, 312 F.3d at 904 (quoting *Murray v. Chicago Transit Authority*, 252 F.3d 880, 889 (7th Cir. 2001)). "[I]solated and/or trivial remarks of a sexual nature do not satisfy the definition of sexual harassment." *Rennie v. Dalton*, 3 F.3d 1100, 1107 (7th Cir. 1993). However, "a single incident of severely offensive conduct is a violation of Title VII." *Aguilera v. Village of Hazel Crest*, 234 F. Supp. 2d 840, 846 (N.D. Ill. 2002).

In this case Mueller claims that Madonia called her at home on three occasions and said that he wanted to "put it in her," "f" her, and have sex with her. He also asked Mueller to spend the night and then go to work with him in the morning. These calls were infrequent and short in duration, and Madonia never touched Mueller, threatened her, exposed himself to her, or made sexual comments or requests at work.[1] At the same time, Madonia's outright solicitation of sex acts from Mueller is arguably more severe than mere "sexually suggestive" comments. *See Jarvis v. Sigmatron International Inc.*, 223 F. Supp. 2d 981, 986 (N.D. Ill. 2002) (explicit and implicit sexual solicitations were more than just the "occasional vulgar banter . . . of coarse or boorish workers"). For purposes of this motion for summary judgment, the Court will assume that a reasonable jury could find Madonia's direct requests for sex on two evenings sufficiently "severe" to alter the terms and conditions of Mueller's employment. *Quantock*, 312 F.3d at 904.

---

[1] Mueller makes much of the fact that on several occasions, Madonia suggested that he provide her with training on Sunday when the dealership was closed. There is nothing in the record to indicate that the suggestions were in any way sexual, notwithstanding Madonia's one-time question whether Mueller was divorced. Thus, it is not evidence of a sexually hostile work environment. *Marting v. Crawford & Co.*, 203 F. Supp. 2d 958, 967 (N.D. Ill. 2002) (citing *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345 (7th Cir. 1999)) ("the complained of conduct must have . . . a sexual . . . character or purpose to support a Title VII claim").

9

*See also Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997) ("[s]ometimes we need not decide whether particular conduct or comments crossed the line and were actionable").

### C. McGrath's Liability

An employer may be subject to vicarious liability for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. *Hardy*, 328 F.3d at 364; *Hill v. American General Finance, Inc.*, 218 F.3d 639, 642 (7th Cir. 2000). If the supervisor's harassment culminates in a tangible employment action, the employer will always be vicariously liable for the harassment. When no tangible employment action is taken, however, an employer may raise an affirmative defense to liability; namely, (1) that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) that the employee failed to take advantage of any preventive or corrective opportunities provided by the employer to avoid harm. *Faragher*, 524 U.S. at 807-08; *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Wolf v. Northwest Indiana Symphony Society*, 250 F.3d 1136, 1142 (7th Cir. 2001).

#### 1. Tangible Employment Action

Mueller argues that as a result of refusing Madonia's requests for sex, "she was ignored, blackballed, ostracized and outcast by Madonia." Pl. Mem., p. 14. Mueller's only evidence of such treatment is that Madonia asked her to buy him coffee, cigarettes and breakfast, made her stand outside his office and ignored her. None of these actions amounts to an adverse employment action. "A tangible employment action constitutes a *significant* change in employment status, such as hiring, firing, failing to promote, reassignment with *significantly* different responsibilities, or a decision causing a *significant* change in benefits." *Ellerth*, 524

10

U.S. at 761 (emphasis added). Though Mueller may have found Madonia's menial assignments and disregard frustrating and unprofessional, "not everything that makes an employee unhappy is an actionable adverse action." *Murray*, 252 F.3d at 888.

Mueller also claims that after she complained about Madonia's conduct, he would not train her "or otherwise work with her to prepare her for the position of Assistant Finance Manager, as promised when she was hired." Cmplt. ¶9. It is undisputed that Mueller was hired into the clerical position of Finance Assistant and McGrath denies that it even has an assistant finance manager position. In any event, there is no evidence regarding the nature of the training Mueller says she was supposed to receive or the length of time it would take her to complete it. Mueller speculates that the training would last three months, but she quit less than four weeks after her employment began. As a result, there is no basis for concluding that the alleged lack of training actually had any negative impact on her advancement at the dealership. *Ellerth*, 524 U.S. at 761-62 ("tangible employment action in most cases inflicts direct economic harm"). *See also Newell v. Micro Center Sales Group*, No. 02 C 2104, 2003 WL 1860272, at *3 (N.D. Ill. Apr. 8, 2003) (in Title VII retaliation claim, "[f]ailure to train could be an adverse employment action if the failure was part of an effort to avoid promoting an employee," but not where "the record is silent as to any unfavorable consequence of the missed opportunity").

Even assuming that the complained-of actions constituted tangible employment actions, Madonia engaged in all of them both before and after he made the harassing telephone calls to Mueller. Thus, there is no evidence that they resulted from Mueller's refusal to have a sexual relationship with him or her complaints about his behavior. *See Martinez v. U-Haul Company of Illinois, Inc.*, No. 99 C 8066, 2001 WL 648637, at *12 (N.D. Ill. June 6, 2001) (defendant could

11

assert affirmative defense to sexual harassment claim because "[t]here [wa]s no evidence . . . that [the plaintiff] suffered any adverse action *as a result of* the alleged harassment") (emphasis added).

The Court notes that in discussing the issue of a tangible employment action, Mueller obliquely suggests that she was constructively discharged because "[a]ny prospect of a healthy productive workplace had been tainted and she could not go on in her job" after receiving Madonia's calls. Pl. Mem., p. 14. A constructive discharge occurs when "an employee's discriminatory working conditions become so intolerable that a reasonable person in her position would be compelled to resign." *Gawley v. Indiana University*, 276 F.3d 301, 315 (7th Cir. 2001). Mueller has in no way demonstrated that she had no choice but to quit her job, particularly since Madonia did not engage in any sexually harassing conduct towards her at work and stopped calling her at home once she complained. Mueller's decision to quit her job is neither a tangible employment action nor a separate basis for relief. *Perry*, 126 F.3d at 1015 (absent extraordinary conditions, "a complaining employee is expected to remain on the job while seeking redress"). *See also Wolf*, 250 F.3d at 1142 (noting the Seventh Circuit has not yet determined whether a constructive discharge constitutes a tangible employment action under Title VII).

### 2. Affirmative Defense

Having determined that Mueller did not suffer a tangible employment action, the Court next considers whether McGrath has established its affirmative defense to liability.

#### a. Prevention and Correction

The first requirement of the affirmative defense is that McGrath took reasonable steps to prevent and correct promptly any sexually harassing behavior. *Faragher*, 524 U.S. at 778;

12

*Ellerth*, 524 U.S. at 765. "One method of demonstrating the exercise of reasonable care is to show the existence of an effective 'antiharassment policy with complaint procedure.'" *Haugerud v. Amery School District*, 259 F.3d 678, 698 (7th Cir. 2001). There is no dispute that McGrath had a formal sexual harassment policy that Mueller knew about and understood. The policy instructed employees who felt harassed to "immediately notify the president, general manager or office manager at once," and employees were generally encouraged to contact these same individuals to discuss any problems. Mueller does not argue that the policy was ineffective, deficient or "merely a disguised run-around."[2] *See Hardy*, 328 F.3d at 365 (policy that encouraged reporting of harassment and suggested various mechanisms to submit grievances was reasonable to prevent and correct sexual harassment).

Instead, Mueller claims that McGrath did not adequately prevent Madonia's misconduct because (1) just a few months earlier, he harassed a co-worker named Natalie Tretyak; (2) a former employee named Sandy Sorice complained about Madonia and a lack of training; and (3) when Mueller told Ahlness about the harassing phone calls, Ahlness said "Oh, my God, not again." Pl. Mem., pp. 9, 12-13. As Mueller sees it, McGrath has disingenuously denied that there were prior incidents of harassment and a reasonable fact finder could consider the dealership's dishonesty "affirmative evidence of guilt." *Id.*, p. 11 (quoting *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 395 (7th Cir. 1998)).

---

[2] Contrary to Mueller's suggestion, the mere fact that McGrath did not enforce its employment application policy in hiring Madonia does not demonstrate that the harassment policy was selectively enforced or ineffective. Pl. Mem., p. 13. Indeed, Mueller followed the harassment policy and the dealership promptly responded to her complaint. Def. Facts ¶¶65, 118, 120, 125-27.

13

As a preliminary matter, Tretyak and Sorice both deny that Madonia harassed them or that they ever complained about harassment. According to Tretyak, Madonia asked her out for drinks after work on a few occasions and she simply asked her friend Linda Yanos for advice regarding how to let him know she was not interested. Def. Facts ¶¶158-67. This is not the type of conduct that rises to the level of sexual harassment. *See Weiss v. Coca-Cola Bottling Co. of Chicago*, 990 F.2d 333, 337 (7th Cir. 1993) (no actionable sexual harassment where the defendant asked the plaintiff for dates on repeated occasions, placed "I love you" signs in her work area and tried to kiss her twice). And there is no evidence that Sorice, who says she left McGrath for personal medical reasons, was sexually harassed in any way. Def. Facts ¶¶146-52. Thus, neither woman serves as an example of unchecked harassment.[3] *See, e.g., Poulos v. Village of Lindenhurst*, No. 00 C 5603, 2002 WL 31001876, at *9 (N.D. Ill. Sept. 3, 2002) (in §1983 case, no evidence of widespread sexual harassment where "the only other female Village employees who gave evidence in the case, emphatically deny that they have been harassed").

Even assuming that Tretyak's conversation with Yanos constituted a complaint of sexual harassment, Mueller claims that Madonia was "reamed out" and "given an earful" for his conduct. Mueller believes that Madonia should have been fired, transferred or suspended but the law only requires action reasonably calculated to prevent future harassment. Pl. Mem., p. 3. *See Dominicak-Brutus v. Urban Property Services Co.*, 217 F. Supp. 2d 911, 917 (N.D. Ill. 2002)

---

[3] Mueller identifies two other women she claims were harassed by Madonia – Janet Garcia and Nancy Guzman. However, Mueller's information is based on the hearsay statements of some unidentified source and, significantly, McGrath has never had any employees by those names. Def. Facts ¶180. *See Minor v. Ivy Tech State College*, 174 F.3d 855, 857 (7th Cir. 1999) ("[c]ourts must be particularly assiduous to enforce the hearsay rule in sexual harassment cases in order to protect the privacy both of alleged victims and alleged harassers against scurrilous rumors").

14

("[a]n employer informed of harassment . . . does not need to take the actions that the victim would like him to take (*e.g.* suspension, termination")); *Carl v. Parmely*, 188 F. Supp. 2d 991, 1006 (S.D. Ill. 2001) ("Title VII . . . does not require an employer to remove a harassing supervisor from his position or to closely oversee him if other reasonable measures are taken with the aim of preventing further harassment"). Whatever action the dealership took – a matter the parties dispute – it was clearly effective because Madonia never asked Tretyak out again after he was told not to do so. Def. Facts ¶165. Thus, the mere fact that Mueller was harassed after this incident does not show that McGrath failed to take appropriate preventive measures. *See Shaw v. AutoZone, Inc.*, 180 F.3d 806, 812 (7th Cir. 1999) ("the law does not require success – it only requires that an employer act reasonably to prevent sexual harassment").

This leaves Ahlness's alleged statement, "not again." Mueller says the comment shows that "[i]t happened again, a female employee had complained about sexual harassment by Madonia and his failure to afford the female employee training and opportunity for advancement." Pl. Mem., p. 12. It is not clear that Ahlness actually made the statement in response to Mueller's claim of harassment as opposed to her complaint about a lack of training. In any event, as explained, there is no evidence that any other women were in fact harassed so Ahlness's alleged statement is insufficient to show that McGrath failed to take appropriate steps to prevent harassment in the workplace.

Mueller next claims that McGrath did not effectively prevent harassment because it did not require Madonia to complete an employment application or undergo a background check. Pl. Mem., p. 11. This, in turn, allegedly led McGrath to turn "a blind eye to Madonia's easily ascertainable record of drunken abuse." Pl. Mem., p. 11. Mueller cites no cases to support her

15

theory that an employer that fails to obtain an employment application or conduct a background check has not effectively prevented harassment under Title VII. And as for the substantive allegations regarding Madonia's DUI convictions and other alcohol-related incidents – all of which occurred prior to Madonia's employment with McGrath – they are not relevant to Mueller's claim of harassment. The mere fact that Madonia may have come to work hung over or drunk is not, in and of itself, sufficient to put McGrath on notice that he might call Mueller at home and ask her for sex. *See, e.g., Anderson v. Leigh*, No. 98 C 50169, 2000 WL 193075, at *6 (N.D. Ill. Feb. 10, 2000) (report referencing alleged harasser's "past history" was "a far cry from establishing that [he] had previously engaged in sexual harassment"). McGrath's motion so strike these references is therefore granted.

Mueller makes only a half-hearted argument that McGrath failed to take prompt corrective action in response to her complaints about Madonia's conduct. Specifically, Mueller, claims that "[r]ather than transferring Madonia, defendant initially suggested it would offer Ms. Mueller finance training in another dealership," but "[w]hen she followed up on the suggested 'opportunity' it turned out the position was not in finance, but was to sell used cars and she was told by the manager that 'women didn't last at the dealership very long.'" Pl. Mem., pp. 3, 15. According to Mueller, "a rational jury might well conclude that the disciplinary action [McGrath] imposed was not remedial or effective enough." *Id.*, p. 13 (quoting *Simon v. City of Naperville*, 88 F. Supp. 2d 872, 877 (N.D. Ill. 2000)).

In making this argument, Mueller neglects to point out that she quit several days before McGrath ever offered her the sales position or she allegedly learned that women did not last long at the dealership. In addition, though she makes the somewhat improbable claim that Ahlness

16

pressured her to write a formal complaint if she wanted training, she also admits that Ahlness told her to think about it over the weekend. Pl. Dep., p. 173. Nevertheless, Mueller decided to quit that Saturday without speaking further to Ahlness. And despite Ahlness's alleged pressure, Mueller sent her a gift and a note thanking her for being her "best cheerleader," an "amazing woman" and "someone [Mueller] will always look up to no matter what lies ahead." Def. Facts ¶114; DX F. The evidence is undisputed that after Mueller reported the harassment to Madonia's supervisor, the dealership immediately investigated the matter and the harassment stopped. Thus, Mueller has no basis for challenging the adequacy of McGrath's corrective measures. *See Gawley*, 276 F.3d at 311 (university exercised reasonable care to prevent and correct harassment where it "had a system in place for employees to report sexual harassment, and . . . as soon as [the plaintiff] used the system, the university took action and the harassment stopped"); *Mandy v. Quad/Graphics, Inc.*, 49 F. Supp. 2d 1095, 1109 (E.D. Wis. 1999) ("[a] stoppage of harassment shows effectiveness, which in turn evidences . . . reasonable calculation").

In sum, McGrath took reasonable steps to prevent and correct sexual harassment in the workplace and has established the first requirement of its affirmative defense.

b. **Mueller's Utilization of Preventive or Corrective Opportunities**

Mueller does not dispute that McGrath can establish the second element of the affirmative defense – that she unreasonably failed to avoid or mitigate harm. *Faragher*, 524 U.S. at 806-07. "The purpose of this requirement is tied to Title VII's primary objective, which is not meant to provide redress but rather to avoid harm." *Gawley*, 276 F.3d at 312. Mueller first complained to Druzik about Madonia's telephone calls on August 26, 2000, three days after they started on August 23, 2000. As noted, as soon as Mueller complained, Madonia never made

17

inappropriate calls to her or sexually harassed her again. Nevertheless, on September 8 or 9, 2000, Mueller resigned. Mueller may have wanted Madonia to be transferred, Pl. Mem., p. 3, but "it was unreasonable for her to quit her job without giving [McGrath's] corrective measures an opportunity" – particularly since they worked. *McGowan v. Palmer House Hilton Hotel Co.*, No. 00 C 0733, 2000 WL 1222196, at *8 (N.D. Ill. Aug. 24, 2000).

Mueller's decision to quit was unreasonable even if she felt that she "could not go on in her job." Pl. Mem., p. 14. There is no evidence of any continuing sexual harassment and, as noted, her general job dissatisfaction is not evidence of intolerable working conditions to support a constructive discharge. *See, e.g., McGowan*, 2000 WL 1222196, at *8 (employer satisfied second element of the *Ellerth/Faragher* affirmative defense where employee quit without giving employer's corrective measures a chance); *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 496 (7th Cir. 1996) ("[d]issatisfaction with a work assignment is, as a matter of law, normally not so intolerable as to be a basis for constructive discharge"). Thus, McGrath has successfully established the second element of its affirmative defense.

## CONCLUSION

For the reasons stated above, McGrath has established an affirmative defense to liability under Title VII and, thus, its Motion for Summary Judgment (Docket Entry #17-1) is granted. McGrath's Motion to Strike Certain Paragraphs of Plaintiff's Statement of Facts (Docket Entry #23-2) is also granted. McGrath's Motion to Deem as Admitted Certain Statements Contained in Rule 56.1 Statement of Facts (Docket Entry #23-1), McGrath's Motion to Strike Plaintiff's

Response Brief (Docket Entry #23-3) and Mueller's Motion to Strike (Docket Entry #27-1) are all denied.

                                           *Nan R. Nolan*
                                           NAN R. NOLAN
                                           United States Magistrate Judge

Dated: July 14, 2003